Argued January 31, decided March 7, rehearing denied April 25, 1911.

## COOKINHAM *v.* LEWIS.

[114 Pac. 88: 115 Pac. 342.]

CERTIORARI—SCOPE OF REMEDY.

1. A writ of review lies only where the tribunal has exceeded its jurisdiction, or has exercised its judicial functions erroneously and contrary to the course of procedure applicable to the matter before it; and does not go to a review of questions of fact, and has nothing to do with the evidence.

WATERS—APPROPRIATION—USES—"WATER CODE."

2. The right to the beneficial use of water to be acquired under the permit applied for under Act Feb. 24, 1909, known as the "Water Code" (Laws 1909, p. 332) § 45 *et seq.*, is not an opportunity to acquire a

monopoly of the water of a stream for promiscuous sale, but must contemplate a use on specific land which, when completed under Section 53, shall become appurtenant to the land to which it is applied.

WATERS—RESERVOIR PERMITS.

3. The primary reservoir permit, provided for by act Feb. 24, 1909, known as the "Water Code" (Laws 1909, p. 337) § 58, does not include the right to divert and use such stored water, but contemplates only a storage of the water in some locality where it can be utilized for irrigation; while the secondary permit provided for thereby contemplates that a user of the water shall acquire a permanent ownership by agreement with the owner for a specific quantity of the stored water for the needs of and use on his land, and when reclamation of the land is completed the water becomes appurtenant to his land.

WATERS—WATER CODE.

4. The "Water Code" (Act Feb. 24, 1909; Laws 1909, p. 319) was enacted in the light of and with reference to the desert land act (Laws 1901, p. 378) and Act Feb. 24, 1909 (Laws 1909, p. 377), substituted therefor, and which created the desert land board, and Act Feb. 22, 1905 (Laws 1905, p. 401), providing for acquiring water for the reclamation of arid lands.

WATERS—APPROPRIATION—APPLICATION FOR PERMIT—REFUSAL—"AND."

5. Under "Water Code" (Act Feb. 24, 1909; Laws 1909, p. 332) § 45, providing that any person intending to acquire a right to the beneficial use of any waters shall, before commencing the construction of any ditch, make application to the State Engineer for a permit to make the appropriation; Section 46 requiring the application to set forth the nature and amount of, the proposed use, and if it be for agricultural purposes to give the legal subdivisions and the acreage to be irrigated. and Section 47 declaring it to be the duty of the State Engineer to approve all applications made in proper form which contemplate the application or water to a beneficial use, but that when the proposed use conflicts with determined rights, or is "a menace to the safety and welfare of the public," the application shall be referred to the board of control for consideration; and it shall be the duty of the board to order refusal of such application, "if * * the public interest demands"—the engineer, as well as the board, may refuse the application, if on facts within their knowledge—as that applicant had no right to reclaim the desert public land described in the application till some agreement should be consummated with the State for the purpose, and that applicants had no beneficial use to which the water could be applied by them—it be considered that the permit would be a menace to the public welfare; the word "and" in the phrase "a menace to the safety and welfare of the public" being evidently used with the meaning of "or."

WATERS—IRRIGATION—APPROPRIATION—APPLICATION FO PERMIT — CONTENTS—SUBDIVISIONS OF LAND.

6. Water Code (Laws 1909, p. 332) § 45, requires one intending to acquire a right to the beneficial use of any water before commencing construction of a ditch to apply to the State Engineer for permission to make the appropriation, and Section 46 requires such application to give the legal subdivisions of the land to be irrigated. Section 58 provides that all applications for reservoir permits shall be subject to provisions

of Sections 45 to 51, inclusive, except that an enumeration of any land proposed to be irrigated shall not be required in the primary permit, but the parties proposing to apply for the beneficial use of the water stored in any reservoir shall file an application for a secondary permit in compliance with sections 45 to 51, inclusive. *Held,* that an application for permit to make an appropriation of certain of the waters of P. river was for a permit to use the public waters of the State, though it also asked for a permit to construct a storage reservoir, and was made under Sections 45 and 46 as well as under Section 58, so that it should give the legal subdivisions of the land to be irrigated, as required by Section 46.

WATERS — APPROPRIATION — APPLICATION FOR PERMIT — APPROVAL BY STATE ENGINEER.

7. Water Code (Laws 1909, p. 333) § 47, requires the State Engineer to approve all applications made in proper form which contemplate the application of water to a beneficial use, but provides that, when the proposed use conflicts with determined rights or is a "menace to the safety and welfare of the public," the application shall be referred to the board of control for consideration, and it shall order the refusal of the application if the public interest demands it. *Held,* that the State Engineer was not bound to approve an application for an appropriation or for a reservoir, intended for a public beneficial use, if the beneficial use was not available to the applicant, though the application stated that the appropriation was for a beneficial use.

WATERS — APPROPRIATION — APPLICATION FOR PERMIT — PRIORITIES OF RIGHT.

8. In view of the purposes of the Water Code (Laws 1909, p. 333) § 47, as shown by the history of its enactment, the prior filing of an application for waters, etc., only gives priority of right where the application is for a public use available to the applicant or for a private use as by a settler, and the provisions of the act as to the application are fulfilled; the provision that no application shall lose its priority because of defects in the application which are remedied within thirty days being the only reference to priority of filing.

From Marion:   WILLIAM GALLOWAY, Judge.

Statement by MR. CHIEF JUSTICE EAKIN.

This is a proceeding by writ of review by R. S. Cookinham and W. A. Thacher against John H. Lewis, H. L. Holgate and F. M. Saxton, comprising the Board of Control of the State of Oregon, and O. C. Finkelnburg, trustee. The facts as brought out at the trial are as follows:

On March 10, 1909, plaintiffs filed with the State Engineer, John H. Lewis, an application for a permit to make an appropriation of 370 second feet of the waters of Powder River in Baker and Union counties, for 120 days, making 88,060 acre feet, to be diverted in section

26, township 6 S., range 40 E., W. M., for the purposes of power and domestic use and to irrigate 30,000 acres of land in township 7 S., ranges 40 and 42 E., township 8 S., ranges 41, 42, and 43 E., and township 9 S., ranges 42 and 43 E., and to construct a storage reservoir to impound the waters of Powder River in Thief Valley with a capacity of 60,000 acre feet, at an estimated cost of $500,000. On March 31, 1909, at 8 A. M., they filed a supplemental application for an additional quantity of water for irrigation upon certain lands, some of which were included in the former application. On the same day at 4:30 P. M., O. C. Finkelnburg, trustee, filed an application with the State Engineer for a permit to construct a storage reservoir in Thief Valley for the storage of waters of Powder River for irrigation, the dam therefor to be in section 26, township 6 S., range 40 E., at an estimated cost of $200,000. Thereupon, on April 12, 1909, the State Engineer, being of the opinion that the proposed use in each case would be a menace to the safety and welfare of the public, referred such applications, by letter, to the Board of Control, with this statement:

"The proposed use in each of the following cases are a menace to the safety and welfare of the public. * * Prior to the examination of these applications, and on March 30, 1909, the vacant and unappropriated lands included in the area described in those applications were withdrawn from entry under the public land laws of the United States by the Secretary of the Interior for irrigation by the State under the Carey Act, or by the United States under the reclamation act. * * Such withdrawal was made at the request of the State Land Board, by order dated March 23, 1909."

On September 11, 1909, after a full hearing, the Board of Control directed the State Engineer to refuse the applications of the party or parties not securing final contract with the Desert Land Board for the reclamation

of said lands; and that he approve the application of the
party securing such a contract.    Plaintiffs, on December
20, 1909, filed a petition in the circuit court for Marion
County, State of Oregon, for a writ of review, reciting
in full the facts above mentioned and the writ was duly
issued the same day.    The return to the writ contains
the transcript of the proceeding before the Board of
Control, together with a full transcript of the evidence
produced before the board.    At the hearing upon the
return, the circuit court sustained the writ and directed
the dismissal of the proceeding before the Board of Con- ·
trol, for the reason, that it had no jurisdiction of the pro-
ceeding, and defendants appeal therefrom to this court.
                    REVERSED WITH DIRECTIONS.

For appellants there was a brief over the names of
*Mr. John L. Rand, Mr. Andrew M. Crawford,* Attorney
General, *Mr. Isaac H. Van Winkle,* Assistant Attorney
General, and *Mr. James T. Chinnock,* with oral argu-
ments by *Mr. Rand* and *Mr. Will R. King.*

For respondent there was a brief over the names of
*Mr. Charles A. Moore* and *Messrs. Hart & Nichols,* with
oral arguments by *Mr. Moore* and *Mr. Julius N. Hart.*

Opinion by MR. CHIEF JUSTICE EAKIN.                    ·

1. A writ of review lies only in cases in which the
lower court, officer or tribunal has exceeded its juris-
diction, or where it has exercised its judicial functions
erroneously and contrary to the course of procedure
applicable to the matter before it: *Garnsey* v. *County
Court,* 33 Or. 201 (54 Pac. 539, 1089).    Therefore, the
writ will only bring up the record, upon which the case
will be reviewed as to questions of jurisdiction and
errors in the proceeding.    It will not review questions
of fact, and has nothing to do with the evidence. *Smith*
v. *Portland,* 25 Or. 297, 301 (35 Pac. 665) ; *Douglas
County Road Co.* v. *County of Douglas,* 6 Or. 299, 303.

The main contention of plaintiffs is that by the terms of sections 45 and 47 of the act of 1909 (Laws 1909, pp. 332, 333; Sections 6624, 6627, L. O. L.), known as the "Water Code," the person first filing an application for a water right is entitled to the first right, and that the law is mandatory upon the State Engineer to approve it, unless the proposed use is a menace to the safety and welfare of the public, in which case he must refer it to the board of control, and that there is nothing before him in this case to disclose any such menace. It was upon this ground that the circuit court sustained the writ.

To comprehend the full meaning of those two sections of the Water Code, it is necessary to review the law relating to the subject. To aid in the reclamation of desert public land, the Congress of the United States, by the act of August 18, 1894, known as the "Carey Act" (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 [U. S. Comp. St. 1901, p. 1554], found also in volume 1, L. O. L., p. 65), and amendments of June 11, 1896 (Act June 11, 1896, c. 419, 29 Stat. 434), March 3, 1901 (Act March 3, 1901, c. 853, § 3, 31 Stat. 1188 [U. S. Comp. St. 1901, p. 1557]), and March 15, 1910 (Act March 15, 1910, c. 96, 36 Stat. 237), authorized the Secretary of the Interior to contract with certain States to grant and patent to the State such desert land, not exceeding one million acres in each State, as the State may cause to be irrigated, reclaimed and occupied by actual settlers. In 1901 the legislature of Oregon accepted the conditions of this offer and provided that, upon the application of any person, desiring to reclaim any desert land, the State Land Board should enter into a contract with the Secretary of the Interior therefor, and enter into such contract as may be necessary to cause the reclamation thereof, with provision for procuring water therefor and the manner of procedure. Laws 1901, p. 378; Section

3283, et seq., B. & C. Comp. For the purpose of still further aiding in the reclamation of arid public lands, the legislature, on February 22, 1905 (Laws 1905, p. 401; Section 6598, L. O. L.), enacted a law for acquiring water for the reclamation of arid lands; created the office of State Engineer, and gave him general supervision of all measurements and records of appropriation of waters of the State, and required him to deliver to the Governor before each session of the legislature a full report of the work of his office with such recommendations for legislation as he may deem advisable.

The legislative act of February 24, 1909 (Laws 1909, p. 377; Section 3860 et seq., L. O. L.), which created the desert land board, of which the State Engineer is a member, again accepted the conditions of the Carey act and made further provision for reclaiming the desert land in this State, and repealed Sections 3283-3293, B. & C. Comp., above cited. The act of February 24, 1909, known as the "Water Code" (Laws 1909, p. 319; Section 6594 et seq., L. O. L.), declares that water rights can only be acquired as in the act provided; and creates the offices of division superintendents and the board of control, of which the State Engineer is a member. The first 44 sections of the act relate to the manner of settling disputed rights among water users and Sections 45 to 47 (Sections 6624, 6626, L. O. L.) relate to the manner of acquiring water rights, and Sections 58 and 59 (Sections 6622, 6623, L. O. L.) provide for reservoir permits. Section 45 provides that any person intending to acquire a right to the beneficial use of any waters shall, before commencing the construction of any ditch, make application to the State Engineer for a permit to make the appropriation. By Section 46 the application shall, among other things, set forth the nature and amount of the proposed use; if for agricultural purposes it shall give the legal subdivisions of the land and the acreage to be

irrigated. *Farmers' Canal Co.* v. *Frank,* 72 Neb. 136 (100 N. W. 286). Section 47, among other things, provides "it shall be the duty of the State Engineer to approve all applications made in proper form which contemplate the application of water to a beneficial use, but when the proposed use conflicts with determined rights, or is a menace to the safety and welfare of the public, the application shall be referred to the board of control for consideration. It shall be the duty of the board to enter an order directing the refusal of such application, if, after full hearing, the public interest demands." Section 58 gives the procedure under a reservoir permit, called a "primary permit" in which an enumeration of any lands proposed to be irrigated under this act shall not be required, but the parties proposing to apply the water stored to a beneficial use shall file an application for a secondary permit, and provision is made for acquiring title to the water by the user as appurtenant to the land irrigated.

2. The right to the beneficial use of water to be acquired under the permit applied for under Section 45 *et seq.,* is not an opportunity to acquire a monopoly of the water of a stream for promiscuous sale, but must contemplate a use upon specific lands which, when completed under Section 53, shall become appurtenant to the land to which it is applied.

3. The primary reservoir permit, provided for by Section 58, contemplates a storage of the water in some locality where it can be utilized for irrigation. The secondary permit contemplates that users of the water shall acquire a permanent ownership by agreement with the owner for a specified quantity of the stored water for the needs of and use upon his land, and when reclamation is contemplated the water becomes appurtenant to his land. The Water Code makes a distinction between a permit for diversion of water and one to construct a

reservoir and store surplus water. The latter does not include the right to divert and use such stored water, which must be the subject of the secondary permit.

4. This Water Code was enacted in the light of and with reference to the desert land act of 1901, above cited, and the act substituted therefor, which creates the desert land board, as well as the act of 1905 above cited. The fact that a permit must be granted by the State Engineer before a right can be initiated indicates that it is not merely a question of priority in filing the application that secures the right. There are many things to be considered by the engineer before approving the application for a permit. If it appears that the time when the construction is to be begun, or completed, as stated in the application, is unreasonable, or if the use is impracticable or not beneficial, the engineer may deny the permit; or if it conflicts with determined rights or is a menace to the safety and welfare of the public, it would be his duty to refer the application to the board of control; and in determining whether a permit shall be approved he is not limited to the recitals in the application. He may act upon any information he may have. By Section 10 of the act of 1905 (Laws 1905, p. 404; Section 6590, L. O. L.), he is required to make hydrographic and topographic surveys and investigation of each stream system and the source of water supply in the State, and report the same to the Governor, and he is thus in a position to determine whether an application will be for a beneficial use or whether any permit applied for would be a menace to the public welfare. With this understanding of the statute upon the subject, and other facts within the knowledge of the State Engineer, we will proceed to apply it to the conditions in this case. It appears that since 1901 the State, through the State Land Board, until the creation of the desert land board, and thereafter through it, has contemplated the reclama-

tion of desert public lands under the Carey act and the appropriation of the surplus waters of the stream for that purpose.

5. Plaintiffs' construction of the Water Code and the duties of the State Engineer would place it in the power of any person or corporation, by an application for a permit, to anticipate the action of the desert land board, and forestall its consummation of any agreement for reclamation of desert public lands except upon such terms as such applicant might dictate, the possibility of which is prevented by the language of Section 47 of the Water Code, viz.:

"It shall be the duty of the board to enter an order directing the refusal of such application if, after full hearing, the public interest demands it."

Under the Carey act, desert public land can only be reclaimed through the State. When reclaimed the title passes to the State, and by the State to the settler. Therefore, plaintiffs in this case, at the time of the application for a permit, had no right to reclaim the desert public land described in their application until some agreement should be consummated with the State for that purpose and they had no beneficial use to which the water could be applied by them. These facts were all within the knowledge of the State Engineer and the board of control, and they were justified in acting upon such information in determining whether a permit would be a menace to the public welfare, and this is the reason given by the board for directing the refusal of the application.

Certainly public interest demands that a permit to impound or control the waters of Powder River in controversy here should only be granted to such person or corporation as under contract with the State will carry out its plans to reclaim this desert land, and it is the duty of the State Engineer and board of control, to act with the desert land board for the accomplishment of

this purpose. Although plaintiffs may have in view the furnishing of water for irrigation of private lands or the creation of power, assuming, without deciding, that the application states facts sufficient for either purpose, yet the much greater interest involved is the reclamation of the desert public lands, and the evident purpose of the plaintiff was to place itself in position to compel the State to contract with it for such reclamation. It is within the province of the board of control to see that both public and private lands are reclaimed, rather than only the latter. The reclamation of desert lands is subject to contract with the State, and it should have the right and opportunity to select the person with whom it shall contract, as well as a voice in determining the terms of the contract, and if there is any possibility of reclamation of these lands it is necessary that the granting of a reservoir permit be delayed until the State has made some agreement with the applicant, otherwise the State will be without power to secure proper contracts; and these are some of the matters that the statute contemplates may be considered by the engineer and board of control in determining whether the permit would be a menace to the public welfare.

The reclamation of the desert public lands is a public enterprise, and is under the control and direction of the State, and the applicant for a permit to appropriate or impound water for the reclamation thereof is to some extent the agent of the State, and has right to exercise the power of eminent domain and by statute is to have a lien upon the lands for the repayment of the amount of his expenditures and interest. Therefore, the private interests of the applicant for a permit must be subordinate to the public interest contemplated by the statute.

At the argument, and in the briefs, much stress was laid by plaintiffs upon the use of the conjunction "and," in Section 47 of the Water Code, in the clause "menace

to the safety *and* welfare of the public." But the next sentence, which authorizes the board of control to direct the refusal of applications "if the public interest demands," indicates that it was intended by the previous clause that a menace to either safety or welfare would be sufficient ground to refuse the application. The use of the disjunctive conjunction was evidently intended, and in construing the statute we are authorized to so treat it where it is necessary to carry out the intent of the statute. 2 Lewis, Sutherlin, Stat. Const. (2 ed.) § 397; *Ransom* v. *Rutherford County* (Tenn.) 130 S. W. 1057, 1062; *People ex rel.* v. *Rice,* 138 N. Y. 151 (33 N. E. 846).

The judgment of the lower court will be reversed and the cause remanded to the lower court with directions to dismiss the writ.

REVERSED WITH DIRECTIONS.

Decided April 25, 1911.

ON PETITION FOR REHEARING.

[115 Pac. 342.]

Opinion by MR. CHIEF JUSTICE EAKIN.

6. It is suggested in the petition that the opinion questions the good faith of plaintiffs. Such was not the intention, and we think the opinion is not susceptible of such an imputation. Neither does it decide the relative rights between plaintiffs and Finkelnburg.

It is also assumed in the petition that plaintiffs' application for a permit was made under Section 58 of the Water Code for a reservoir permit only, and suggests that the requirement of Section 46 that the application shall give the legal subdivision of the land to be irrigated has no application to a petition for a reservoir permit. But counsel overlook the fact that the application is for a permit to use the public waters of the State,

namely, "370 cubic feet per second of the flow of Powder River," thus claiming under Sections 45 and 46, as well as 58.

7. They also assume that it is sufficient to state in the application for the permit that the appropriation is for a beneficial use, which the engineer must accept as conclusive upon that question. But the statute only requires the engineer to approve the application when, among other things, it contemplates the appropriation of water to a beneficial use. Any language in the opinion that might be construed to hold that the engineer can arbitrarily control or dictate whose applications for a permit shall be allowed was not so intended. He is only required to approve an application when it complies with the conditions of Section 47, and its sufficiency depends upon whether there is a beneficial use to which the water can be applied, and not alone that the application recites that fact. If the application is not approved by him, it shall be referred to the board of control, which can direct the engineer to deny it, if public interests demand. If the application for an appropriation first filed is for a private use or for a public use, which is available to the applicant, then the engineer must approve it; the other conditions being fulfilled. But he is not required to approve an application for an appropriation or for a reservoir, intended for a public, beneficial use, which is not available to the applicant. The beneficial use in this case was not available to plaintiffs and that is the weakness of plaintiffs' position here.

8. This answers also plaintiffs' contention that priority of filing gives priority of right. No doubt the first thing should have the first right when all the terms of the law, as to the application, are fulfilled, which would be the case in an application for a private use, as by a settler upon his own land, or for a public use available to the applicant, which in either case will not be a menace to

public interests. The only reference in the statute to priority of filing is that no application shall lose its priority on account of defects in the application, which are remedied within 30 days.

In urging that the priority of filing must control, counsel suggests that the Water Code was prepared by the Oregon Conservation Commission, which was familiar with both the law and the subject, and that the language used in the act should be strictly followed in giving plaintiffs' application priority. Since plaintiffs refer to the intent of the commission, we are justified in referring to it as well as to the intent of the legislature. In the opinion we only referred to previous statutes on this subject to show the attempts of the State to utilize its surplus water of the lakes and streams in reclaiming arid land, as well as for other purposes. Congress took the initiative in the matter and the State of Oregon, since the Carey act (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 [U. S. Comp. St. 1901, p. 1554]), has sought to co-operate with Congress, and the Oregon Conservation Commission, at first a voluntary organization, but in 1909 made a creature of statute, has been working to the same end, which resulted in the State legislation of 1909, with a view to great public enterprises for the utilization of the surplus waters and the reclamation of arid lands. In the report of the commission to the Governor, of date November, 1908, as to the conditions and possibilities under consideration, which is exhaustive on that subject, the defects of the former methods of acquiring water rights are set forth and the undertaking contemplated by the commission outlined, namely, to conserve the surplus waters, as well as to settle and make definite water rights already existing as the only means of reclaiming arid lands of the State under the Carey act (see pages 66, 71 and 73 of the report), under the control of the State in a manner not possible by

private efforts alone. It is stated by the commission, at page 89 of the report, that "the desired laws (as to reclamation) can now be framed in harmony with the proposed legislation on the subject of water rights, which should be and is the necessary foundation of reclamation by the State." That statement shows that these laws were intended to be dependent upon each other, and to constitute a State system of water title as a basis of sale to arid land owners or to settlers upon such land. The grant of the Carey act is upon the proviso that the State will assume the responsibility of reclamation, which includes the procuring of water therefor.

By Section 5 of the desert land board act (Section 3864, L. O. L.), it is provided that the board will contract with an applicant to reclaim the land when it appears to it that the plan is feasible, that the applicant is financially able to complete the work, and that its completion will be to the best interests of the State; the contract to be let to the lowest responsible bidder, when the estimate of the lien for costs is reasonable. Plaintiff's construction of these legislative acts would deprive the board of any discretion in these matters, and thus defeat the very purpose of the statute. The whole purpose of the present system of water laws has been developed with a view to State control to reduce legislation to a system that shall accomplish this reclamation, together with the other uses of public water as a great public enterprise, carried out by an administrative system that will also accomplish a speedy adjustment of relative rights through these boards, not only of individual cases, but of the stream system.

The petition is denied.

REVERSED: REHEARING DENIED.